CHANCERY.    **Geo. G. Fetter & Co. *vs* W. Cirode *et al.***

*Case* 94.        APPEAL FROM THE LOUISVILLE CHANCERY COURT.

*Liens.    Misrecitals.    Bankruptcy.*

*May 1.*        CHIEF JUSTICE EWING delivered the opinion of the Court.

Case stated.        W. CIRODE, Wm. W. McGruder, and Lilburn McGru-
der, holding severally, two judgments against L. McGru-
der & Co. and claims against them for debts paid as their
sureties, filed their bill to set aside several conveyances
as fraudulent, made by them jointly and individually,
some absolutely, one in trust and others in mortgage to
George G. Fetter & Co. as a company or as individuals,
and to subject the property conveyed and the funds in
their hands, derived from sales made of portions of said
property, to the payment of their demands. By reason
of the numerous conveyances and large amount of debt
secured and paid, the record has been protracted to a
great length, and been rendered exceedingly complicated.
Our labors have been greatly lessened and our conclu-
sions facilitated by the clear and systematic view of the
facts and matters involved, presented by the Chancellor,
which alone could have been accomplished by the most
untiring labor, and scrutinizing investigation and re-
search.

A discharge in
bankruptcy ex-
onerates the per-
son but not ef-
fects sought to
be subjected by
suit in which a
lien has attach-
ed.
        After the interlocutor was pronounced, Tilman Mc-
Gruder, one of the debtors, by leave of the Court, filed
an amended answer and plea, in which he sets up his dis-
charge under the bankrupt statute of the United States,
approved the 19th August, 1841. We entirely concur
with the Chancellor in the opinion expressed by him, as
to the effect of this discharge, namely, that it exonerates
Tilman McGruder from a decree *in personam*, but does
not discharge the property and *choses in action*, specifical-
ly sought to be subjected to the complainants demands,
from liability to their suit.

By the institu-
tion of a suit in
        This suit was instituted about eighteen months before
the bankrupt statute was approved, and process had been

FETTER & Co.
vs
CIRODE, et al.

Chancery to set aside a conveyance of property and subject it to complainant's demand and service of process, a lien attaches in favor of complainant, which was not divested by proceedings in bankruptcy vs defendant.

executed on the parties, and the suit was in vigorous prosecution long before the bill was introduced into Congress. By such service of process and pendency of the suit, a lien attached in favor of the complainants, upon the effects sought to be subjected, which was not divested or ousted by the statute; for by the last clause of the second section, it is expressly provided, "that nothing in this act contained shall be construed to annul, destroy, or impair any lawful rights of married women or minors, or *any* *liens*, mortgages or other securities on property, real or personal, which may be valid by the laws of the States respectively, and which are not inconsistent with the provisions of the second and fifth sections of this act." And there is nothing in the second or fifth sections inconsistent with or repugnant to the *lien* which attached in favor of the complainants, by the prior institution and pendency of their suit, upon the property and effects sought to be subjected, specifically, to the payment of their demands.

We will not stop to enumerate the points and principles discussed and determined by the Chancellor, in which we entirely concur with him. Suffice it to say, that we concur with him throughout, and approve of all the positions taken and principles settled by him in his elaborate and lucid opinion, with the exception of a few particulars, which we will notice:

1st. We think there were two debts of two hundred dollars each, paid by the young Fetters to Thruston and Butler, and their account as to both those claims should have been allowed. The fact that there were two debts of the amount stated, paid, is proven by C. M. Thruston and Daniel Fetter, Sr.

2nd. Though we have been much perplexed in coming to the conclusion, we also incline to the opinion that injustice has been done the young Fetters, in declaring the mortgage deeds of the 14th and 19th June, 1837, executed by Tilman McGruder to them, fraudulent and void, and in depriving them, in the settlement, of the sums paid by them, on the two bills drawn on Miller of Natchez, amounting to upwards of $4000.

FETTER & Co.
*vs*
CIRODE, *et al.*

Case where a misrecital in a mortgage, which could not have been the result of an unfair motive, held not to prejudice mortgagee.

Those two bills were certainly *paid* by them, as is clearly proven, (the one on the 8th and the other on the 12th of June, 1837,) *before* those mortgage deeds were executed. They and T. McGruder deny expressly that they were paid by or out of the funds of the latter, or that the amount or any part of it has ever been refunded, and there is no proof controverting their denial, or establishing the contrary. There was, therefore, a *motive and inducement* for the execution of the deeds and a valuable consideration to support them. Though there is a misrecital in the deed in stating that the young Fetters were indorsers on both of the bills, when in fact they were indorsers on one of them only, and not on the other, there could have been no fraudulent motive for the misrecital, or purpose to be effected by it, as the obligation to secure its re-payment was as strong and the right to do so as legitimate, and the inducement as persuasive, if not more so, when paid for the honor of the drawer and to save his credit in Bank, where the bill was negotiated, or out of Bank, as if they had paid it as indorsers. They *had paid* it, and having paid it, they had a right to be secured. The misrecital must have occurred through mistake and not through design; through carelessness, unskilfulness, or misapprehension of the draftsman, which may and does frequently happen, by committing the preparation of such instruments to careless, ignorant, or incompetent persons. One thing is certain, it could not have happened through design, as no motive for design could have existed.

In the same way it may be presumed that the mistake in reciting that they had paid the note of Tilman Mc-Gruder to the Bedford Branch Bank of Indiana, on which they were indorsers, which was secured by the two deeds in question, when in fact the said debt was not at that *time paid*, nor were they *indorsers* on the same. Mc-Gruder was the drawer or promisor, and Daniel Fetter, Sr. the only indorser. Though the debt was not then paid, it was afterwards paid by them. Though it was not then paid, the day of payment was near at hand, and it being a Bank debt, and promptitude in the payment required, the presumption is, that McGruder in making

provision through the young Fetters, to pay the bills at the Kentucky Banks, which had been protested, as the means of saving his credit, he would also look to and provide for the renewal and payment of the note to the Bedford Branch, and that they had promised to renew it, becoming indorsers, and ultimately to pay it. And the note for renewal may have been, and was most likely at that time prepared, with the young Fetters and Shryer as indorsers, as à note thus indorsed, is mentioned and re. cited as one of the debts to be paid, in the bond and mortgage executed by them to Daniel Fetter, Sr. on the 24th June, (a few days after the date of the last mort. gage or mortgage of the 19th June,) which provided for the payment of certain debts out of the two lots sold and conveyed to the young Fetters by Daniel Fetter, Sr. Be this as it may, the presumption is that they did undertake or assume to pay this debt also, and the mortgages were intended to secure them on account of this assumpsit. But the draftsman, following up the previous recitals as to the bills having been previously paid by the young Fetters, also recited the note as having been paid, instead of reciting their assumpsit to renew and pay it, believing, as he might, that whether they paid it before or afterwards, could make no difference as to the validity of the mortgages. We rather, in charity, presume that this mis-recital happened in innocent mistake or oversight, rather than through covin and design, since so shallow a device and one that could have been detected at any moment by reference to the Bank, or by bill in chancery, and the positive proof of the officers of the Bank, could scarcely have been resorted to by the weakest mind, as a device to cover over and secure the property of McGruder from the claims of creditors. If fraud was intended, a stratagem more deeply _laid might easily and most likely would have been devised. The fact that the payment of this debt was provided for by the subsequent deed of the 24th of June, cannot affect the validity of the prior deeds. The only effect it can have is to reduce the amount for which the mortgages stands responsible. The statements in the answers of young Fetter, that funds had not been furnished to pay those debts, should not be understood

Fetter & Co.
vs
Cirode, et al.

as intended to express the idea that the debt to the Bedford Branch had not been paid by them under their obligation to pay it in part consideration of their purchase of the two lots from Daniel Fetter, Sr. of the 24th of June, as their account exhibited, with and as a part of their answer, shows that it was paid on that account.

It is true that an amount of funds of and belonging to McGruder, for whiskey, sugar, and other articles of produce sold by the young Fetters, as commission merchants, for his benefit, commencing in March, 1837, and running through the year and up to the 20th of January, 1838, amounting in the aggregate to upwards of $9000, passed through the hands of the Fetters, and it is remarked by the Chancellor, as an unusual and strange circumstance, that they did not retain or apply these funds towards the payment of sums advanced by them in the payment of the bills aforesaid. This should not excite astonishment or be regarded as unusual or strange, when it is recollected that these debts were assumed and paid as the means of saving the credit of McGruder and his indorser, Fetter, and had been well secured, and when other small debts were pressing upon the former, which it was necessary for him, out of the proceeds of his mill and distillery, to provide for, as well as to maintain his family and establishment; and when further, it is observed, by looking into the accounts between the Fetters and McGruder, that the charges against McGruder in their favor, for articles furnished and small sums paid on his order, generally ran ahead of and exceeded the amounts derived from sale of whiskey and other articles of produce furnished by him; and he was often largely in their debt before the proceeds of sales came to their hands, and at no time had they a surplus fund of any amount worth attention in their hands, during the whole period of their commission business for him, which could have been applied towards the re-payment of the amounts paid on the bills; and when the account closed he was in their debt upwards of $500. Upon the whole, we think that in the face of the positive denial of all the parties concerned, and in the absence of all proof as to the fraudulent purpose and intention, or a single extraneous circumstance

evidencing covin or deceit, or a fraudulent intention to cover over the property mortgaged, in secret trust for the benefit of the mortgagor, or to hinder and delay other creditors, beyond the purpose of securing an honest debt, justly due and unpaid, we cannot indulge in the presumption of fraud, covin, or design, based upon the mere erroneous recitals in the deeds alluded to, which may and often does happen through mistake, inadvertence, or carelessness in the draftsman.

3rd. Nor can we think that the facts exhibited present any ground for impeaching the deed of the 5th July, 1837, executed by Daniel Fetter to Stewart, Murray and G. G. Fetter, as to the sum secured to the latter, or as to that amount of the Cockrain debt for which he was bound as security. No purpose of fraud is proven; on the contrary, it is expressly proven that the plan was suggested by counsel as the best and shortest mode of securing an amount of the Cockrain debt equal to the amount which the property mortgaged to Stewart and Murray was supposed to be worth, over and above the amounts of their demands. Though the method adopted was awkward and illy advised, it was not fraudulent, nor was it devised, concocted, or adopted with the fraudulent motive of hindering or delaying creditors, but on the contrary, with the honest purpose, under the advice of counsel, that it was the shortest and best mode of indemnifying against an existing liability. The consideration which moved to the act was valuable and the purpose honest, and it should not be vacated by informality in the mode. He should be allowed to hold the note and the lien as a security for an amount of the Cockrain debt which he may be made to pay.

We have noticed the cross errors filed, which question the Chancellor's opinion in relation to the conveyances of the lots in Louisville to Mrs. Hughes, and deem it unnecessary to say more than to express our entire concurrence in his views and conclusions. As to the lands in Indiana, conveyed to Mrs. Hughes and Shryer, the Chancellor had no jurisdiction of the subject. They are not subject to, nor could be reached by an execution issuing on a judgment in Kentucky; nor could the Chancellor

here annul the sale or subject the lands to the payment of the complainants demands. Had Mrs. Hughes, as a fraudulent vendee or donee, sold the lands and received the proceeds, she might, perhaps, be rendered personally liable for their amount here, in satisfaction of the claims of the creditors of her grantor, but as no such sale has been made, she cannot be made responsible here, though the sale to her should be adjudged to be fraudulent.

For errors before noticed, the decree of the Chancellor is reversed and cause remanded, that an account may be taken and decree rendered, not inconsistent with this opinion; and the appellants are entitled to their costs in this Court, on their appeal as well as on the cross errors assigned.

*Guthrie* for appellants: *Browne* for appellees.